**[Cite as *Miracle vs. Petit*, 2020-Ohio-1567.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

SHAWN MIRACLE,

    PLAINTIFF-APPELLANT,

    v.

DON PETIT, REGISTRAR, OHIO,
BUREAU OF MOTOR VEHICLES,

    DEFENDANT-APPELLEE.

CASE NO. 9-19-50

O P I N I O N

Appeal from Marion Municipal Court
Trial Court No. CRS 19 2800

Judgment Affirmed

Date of Decision:  April 20, 2020

APPEARANCES:

    *Ted Coulter* for Appellant

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant Shawn Miracle ("Miracle") appeals the judgment of the Marion Municipal Court. He challenges his administrative license suspension ("ALS"), arguing (1) that there were not reasonable grounds to believe that he was driving in violation of R.C. 4511.19 and (2) that he did not refuse to take a breathalyzer test on request. For the reasons set forth below, the judgment of the Marion Municipal Court is affirmed.

*Facts and Procedural History*

{¶2} At 2:16 A.M. on April 19, 2019, Trooper Andrew Shellhouse ("Trooper Shellhouse") was on patrol and saw a vehicle "stopped past the white stop bar for the intersection into the crosswalk." Tr. 16. Trooper Shellhouse testified that the vehicle's left turn signal had been activated even though a left turn at this intersection would cause a driver to go the wrong way down a one-way street. Tr. 16-17. He also testified that he saw this vehicle make a marked lanes violation. Tr. 18. Trooper Shellhouse then initiated a traffic stop on this vehicle. Tr. 18. Miracle was the driver. Tr. 18.

{¶3} Trooper Shellhouse testified that, after he approached the vehicle, he "detect[ed] the odor of an alcoholic beverage coming from [Miracle's] breath. His eyes were bloodshot and glassy. His speech was slurred, and his movements were relatively sluggish." Tr. 18. Trooper Shellhouse further testified that he "observe[d] on the dash that the high beam indicator was activated * * *." Tr. 18. Miracle told

Trooper Shellhouse that he had had "a couple of beers" that night. Tr. 21. At this point, Trooper Shellhouse administered a Horizontal Gaze Nystagmus Test ("HGN Test"). Tr. 21. Trooper Shellhouse observed six clues in Miracle's eyes during the HGN Test. Tr. 30. After the HGN Test, Trooper Shellhouse took Miracle to the Multi-County Correctional Facility. Tr. 33.

{¶4} At the correctional facility, Trooper Shellhouse asked Miracle to submit to a breath test. Tr. 33. Miracle agreed and blew into the breathalyzer machine two times, but neither breath yielded a sufficient sample to produce an accurate reading. Tr. 34. Trooper Shellhouse then asked Miracle for a urine sample. Tr. 34. Trooper Shellhouse later testified that, in response to this request, Miracle mentioned that he had to use the rest room. Tr. 34. Trooper Shellhouse "told him to hang tight for me" and to "have a seat on the bench until I was ready to collect the urine sample from him." Tr. 34-35.

{¶5} Trooper Shellhouse also testified that the corrections officer instructed Miracle to sit on the bench until the urine test was ready. Tr. 34. Subsequently, the corrections officer again instructed Miracle again to sit on the bench because Miracle "randomly would stand up and look around." Tr. 35. Trooper Shellhouse stated that he went to his patrol car to obtain a test kit for a urine sample. Tr. 35. However, Miracle went to the restroom before Trooper Shellhouse could obtain a urine sample. Tr. 36.

{¶6} Miracle was charged with operating a vehicle while impaired in violation of R.C. 4511.19(A)(1)(a). Doc. 4. On April 29, 2019, Miracle filed an ALS appeal. Doc. 1B.[1] On July 22, 2019, the Marion Municipal Court heard Miracle's appeal of his ALS. Tr. 1. On July 24, 2019, the Marion Municipal Court issued a judgment entry that upheld Miracle's administrative license appeal. Doc. 4B. On August 14, 2019, a jury trial was held on the OVI charge. Doc. 32. On the day of the trial, the jury returned a verdict of not guilty. Doc. 31.

{¶7} The appellant filed his notice of appeal of the trial court's ruling on his appeal of his ALS on August 23, 2019. Doc. 5B. On appeal, Miracle raises the following two assignments of error:

**First Assignment of Error**

**The trial court erred in finding the arresting law enforcement officer had reasonable grounds to believe that the plaintiff-appellant was operating a motor vehicle in violation of O.R.C. 4511.19 on April 19, 2019.**

**Second Assignment of Error**

**The trial court erred in finding the plaintiff-appellant refused to do the breathalyzer test as requested of him on April 19, 2019.**

---

[1] The docket numbers followed by the letter "B" are from the ALS appeal in Case No. 19-CRS-2800. The docket numbers that are not followed by a letter are from Case No. 19-TRC-2595.

*First Assignment of Error*

**{¶8}** Miracle challenges his ALS, asserting that Trooper Shellhouse did not have reasonable grounds to believe that he was operating his vehicle in violation of R.C. 4511.19.  *See* R.C. 4511.197(C)(1).

Legal Standard

**{¶9}** "An ALS is a civil matter that is remedial in nature and distinct from the criminal charge * * *." *State v. Brown*, 2017-Ohio-678, 86 N.E.3d 87, ¶ 15 (3d Dist.).  If criminal charges for a violation of R.C. 4511.19 are brought against a motorist, "[a]ny subsequent finding that the person is not guilty of the charge that resulted in the person being requested to take the chemical test or tests under [R.C. 4511.191(A)] * * * does not affect the suspension."  R.C. 4511.191(D)(1).

**{¶10}** An individual has a right to appeal an ALS, but "[t]he scope of that appeal is limited to whether certain conditions, predicates to the suspension, have not been met." *State v. Huffman*, 6th Dist. Wood No. WD-05-007, 2005-Ohio-6005, ¶ 8.  *See* R.C. 4511.197(A).  To establish that an ALS should not be continued, the licensee must establish one of the following conditions is not present:

> **(1) that the arresting officer lacked reasonable [grounds] to believe that the operator has violated R.C. 4511.19(A) or (B); (2) that the law enforcement officer failed to request the arrested person to submit to the testing; (3) that the arresting officer failed to inform the person of the consequences of refusing to take the test; and as applicable in this case, (4) that the arrested person did not refuse to submit to the chemical test or tests requested by the officer.**

*Westlake v. Pesta*, 8th Dist. Cuyahoga No. 92150, 2009-Ohio-4713, ¶ 4.

{¶11} "On appeal, the licensee has the burden of showing that one of these conditions was not satisfied by a preponderance of the evidence." *State v. Brown*, 12th Dist. Clermont No. CA2013-04-029, 2013-Ohio-4981, ¶ 8. *See* R.C. 4511.197(D).

> **If, during the appeal, the judge * * * of the court * * * determines that all of those conditions have been met, the judge * * * shall uphold the suspension, continue the suspension, and notify the registrar of motor vehicles of the decision on a form approved by the registrar.**

R.C. 4511.197(D). "Ohio courts have consistently applied the totality-of-the-circumstances test to determine if there were reasonable grounds to believe that a person had been operating a motor vehicle while under the influence of alcohol." *State v. McCaig*, 51 Ohio App.3d 94, 94, 554 N.E.2d 925, 926 (6th Dist. 1988), citing *Atwell v. State*, 35 Ohio App.2d 221, 301 N.E.2d 709 (8th Dist. 1973).

Legal Analysis

{¶12} In this case, Trooper Shellhouse testified that he saw Miracle's vehicle "stopped past the white stop bar for the intersection into the crosswalk" at 2:16 A.M. Tr. 15-16. Further, Trooper Shellhouse noticed that Miracle's left turn signal was activated even though turning left at this particular intersection would result in Miracle's vehicle going the wrong way down a one-way street. Tr. 17. Trooper Shellhouse began following Miracle's car at this point. Tr. 17. He testified that he

then observed Miracle make a marked lanes violation. Tr. 18. Trooper Shellhouse then performed a stop of Miracle's vehicle. Tr. 18.

{¶13} On appeal, Miracle argues that the activation of his left turn signal did not provide grounds for a traffic stop. However, Trooper Shellhouse observed that Miracle's vehicle was past the marked stop line at an intersection during a red light. Under R.C. 4511.13(C)(1)(a), drivers are to "stop at a clearly marked stop line * * *." R.C. 4511.13(C)(1)(a). Thus, Trooper Shellhouse witnessed Miracle fail to comply with R.C. 4511.13(C)(1)(a), providing a reasonable articulable suspicion for Trooper Shellhouse to conduct a traffic stop. *See State v. Miller*, 3d Dist. Marion No. 9-14-50, 2015-Ohio-3529, ¶ 25 (holding a law enforcement officer had probable cause to conduct a traffic stop where a vehicle was "stopped * * * astride a clearly marked stop line"); *State v. Tyson*, 2015-Ohio-3530, 41 N.E.3d 450, ¶ 25 (3d Dist.).[2]

{¶14} Trooper Shellhouse approached Miracle's car. Tr. 18. In his initial interaction with Miracle, Trooper Shellhouse detected the smell of an alcoholic beverage coming from Miracle's breath. Tr. 18. He also noted that Miracle's "speech was slurred and, and his movements were relatively sluggish as he was collecting his information * * *." Tr. 18. Miracle's eyes were also "bloodshot and

---

[2] *Tyson* and *Miller* address stop lines in the context of stop signs as regulated by R.C. 4511.43(A). *Tyson, supra*, at ¶ 25. *Miller, supra*, at ¶ 25. In this case, the issue is whether Miracle failed to comply with R.C. 4511.13(C)(1)(a) by passing a stop line marked at a stop light. As both R.C. 4511.43(A) and R.C. 4511.13(C)(1)(a) require drivers to stop at a clearly marked stop line when a traffic control device requires a driver to stop, we find the definitions set forth in *Tyson* and *Miller* to be herein applicable. *Tyson, supra*, at ¶ 25. *Miller, supra*, at ¶ 25.

glassy." Tr. 50. Trooper Shellhouse further testified that Miracle's high beam indicator light was activated on his dashboard. Tr. 18. At this point, he asked Miracle to step out of his vehicle. Tr. 19.

{¶15} Trooper Shellhouse testified that Miracle stumbled as he exited the vehicle and that Miracle admitted to drinking "a couple of beers" that evening. Tr. 19, 21. At this point, Trooper Shellhouse administered an HGN Test on Miracle. Tr. 21. Trooper Shellhouse testified that he observed "six out of six" HGN Test clues in Miracle's eyes. Tr. 30. Trooper Shellhouse stated that he administered the Lack of Convergence Test and that Miracle demonstrated a lack of convergence. Tr. 30-31. Miracle was able to perform the Counting Test correctly but did not perform the ABC Test as instructed. Tr. 32, 49. Trooper Shellhouse said that he did not administer the Standardized Field Sobriety Test because Miracle informed him that he had medical issues with his back and legs that could make these tests dangerous on the side of the road. Tr. 31.

{¶16} Miracle testified that, on the night he was pulled over, he was driving his sons around because they had been drinking. Tr. 74-75. He testified that the odor of alcoholic beverages that Trooper Shellhouse smelled came from his sons. Tr. 75. Miracle testified that, while he did have his signal on to turn left, he ultimately did not turn that direction and go the wrong way down the street. Tr. 66. He also stated that he talks fast, which is why his speech sounded slurred and that his disability was the reason that he stumbled. Tr. 73, 75. Miracle further testified

that he did not have his high beams activated. Tr. 69, 80. Miracle's son also testified that, when he went to retrieve Miracle's vehicle from the side of the road, that the high beams were not activated at that time. Tr. 6.

{¶17} Based on this evidence, the Marion Municipal Court "f[ound] that considering the totality of the circumstances, Trooper Shellhouse had reasonable grounds to find that [Miracle] was operating a vehicle while under the influence of alcohol and/or a drug of abuse * * *." Doc. 4B. On appeal, most of Miracle's arguments consider each of the factors that led Trooper Shellhouse to believe that Miracle was operating a vehicle in violation of R.C. 4511.19 in isolation. Miracle asserts that each of these factors do not individually provide evidence of the "reasonable grounds" required in R.C. 4511.197(C)(1) to continue an ALS.

{¶18} However, courts are to consider the totality of the circumstances in making a determination on this matter. *See McCaig*, supra, at 94. Considered together, the factors that Trooper Shellhouse listed—Miracle operating a vehicle at 2:16 A.M., driving past the stop line, using his left turn signal, having the odor of an alcoholic beverage on his breath, slurring his words, having glassy eyes, stumbling out of his vehicle, having indicators of intoxication during his HGN Test, demonstrating a lack of convergence—provided reasonable grounds for Officer Shellhouse to believe that Miracle was operating a vehicle in violation of R.C. 4511.19. *See State v. Evans*, 127 Ohio App.3d 56, 711 N.E.2d 761, fn. 2 (11th Dist. 1998) (compiling a nonexclusive list of indicators of intoxication that include the

time of the stop, erratic driving, glassy eyes, slurred speech, odor of alcoholic beverages, an admission of alcohol consumption, and a lack of coordination).

{¶19} After reviewing the totality of the evidence in the record, we conclude that Miracle has not carried the burden of establishing, by a preponderance of the evidence, that Trooper Shellhouse did not have reasonable grounds to believe that Miracle was operating his vehicle in violation of R.C. 4511.19. Thus, Miracle did not establish that the predicate condition to an ALS listed in R.C. 4511.197(C)(1) was not present in this case. In view of the totality of the circumstances, we conclude that Trooper Shellhouse did have reasonable grounds to believe that Miracle was operating his vehicle in violation of R.C. 4511.19. For this reason, Miracle's first assignment of error is overruled.

*Second Assignment of Error*

{¶20} Miracle challenges his ALS, arguing that the Marion Municipal Court erred in determining that he refused to take a breathalyzer test on Trooper Shellhouse's request. *See* R.C. 4511.197(C)(4)(a).

Legal Standard

{¶21} "If a person under arrest for operating a vehicle while intoxicated or impaired refuses to submit to a chemical test, the arresting officer, acting on behalf of the Registrar of Motor Vehicles, must seize the operator's license and immediately administratively suspend the driver's operating privileges." *State v. Brown*, 2013-Ohio-4981, *supra*, at ¶ 8, citing R.C. 4511.192(D)(1). "An

administrative license suspension is an automatic consequence of a refusal to take a chemical test." *State v. Hoover*, 123 Ohio St.3d 418, 2009-Ohio-4993, 916 N.E.2d 1056, ¶ 25, citing R.C. 4511.191(B)(1).

{¶22} "A person's refusal to submit to a chemical test occurs whenever a preponderance of the evidence demonstrates that such person's conduct provides justification for a reasonable requesting officer to believe that the person was capable of refusing the test and displayed an unwillingness to submit to the test." *State v. Brown*, 2013-Ohio-4981, *supra*, at ¶ 10. Thus, "[a] refusal to submit to a chemical test of the blood, breath or urine will occur where a person, by his acts, words or general conduct, manifests an unwillingness to submit to the test." *State v. Mattes*, 2017-Ohio-7666, 97 N.E.3d 876, ¶ 19 (5th Dist.), citing *Hoban v. Rice*, 25 Ohio St.2d 111, 267 N.E.2d 311 (1971), paragraph three of the syllabus. If a person is unable to provide a sufficient breath sample for the requested test, this does not constitute a refusal. *State v. Williams*, 6th Dist. Ottawa No. OT-03-020, 2004-Ohio-2453, ¶ 12.

{¶23} Further, "[a] trial court's determination of a refusal must 'be based upon an objective standard, not a subjective standard.'" *Brown*, 2013-Ohio-4981, *supra*, at ¶ 11, quoting *Hoban* at 117 (1971). "The subjective state of mind of the licensee cannot control the outcome of the proceedings, and a police officer is not required to know the state of mind of the person arrested * * *." *Brown*, 2013-Ohio-4981, *supra,* at ¶ 11, quoting *Hoban* at 117.

-11-

Legal Analysis

{¶24} In this case, Trooper Shellhouse testified that he asked Miracle if he would take a breathalyzer test at the Multi County Jail. Tr. 32-33. He stated that Miracle twice blew into the breathalyzer machine but that neither of the samples was sufficient to support an accurate reading. Tr. 34. Trooper Shellhouse stated:

> **I explained to him before [the Breathalyzer Test] * * * how he's supposed to seal his lips around the small part of the mouthpiece, blow into the machine nice and steady, nice and hard until I tell him to stop. He would begin to do that initially and then all of a sudden you can hear a difference through that hose at the same time, based off of my experience with the machine, that there's not much air flow moving through as there was initially. I had stopped him a couple times as it starts filling up that meter on percentages, I would stop him because the percentage would stop.**

Tr. 96-97. *See Mattes, supra*, at ¶ 15. Trooper Shellhouse stated that he got eight percent on Miracle's first attempt and sixteen percent on Miracle's second attempt.[3] Tr. 97. Trooper Shellhouse testified that he did not notice any indications that Miracle had breathing difficulties during the traffic stop. Tr. 36. He also did not observe any indications that Miracle would have difficulty drawing a deep breath for the breathalyzer test. Tr. 36-37.

{¶25} At this point, Trooper Shellhouse asked Miracle for a urine sample. Tr. 34. Miracle stated that he had to go to the bathroom, so Trooper Shellhouse told him to "hang tight" and "to sit on the bench." Tr. 34, 63. Trooper Shellhouse then

---

[3] Trooper Shellhouse testified that these readings were out of one hundred percent. Tr. 96.

went to his patrol car to obtain a urine test kit. Tr. 36. Trooper Shellhouse testified that the corrections officer also told Miracle to remain seated on the bench. Tr. 34. However, Miracle used the restroom before Trooper Shellhouse could administer the urine test. Tr. 36. Trooper Shellhouse affirmed that he believed Miracle knew he was not supposed to use the restroom and disobeyed the orders given to him because he "instructed [Miracle] to have a seat on the bench until [he] was ready to collect a urine sample." Tr. 62-63.

{¶26} Miracle testified that he had trouble blowing into the breathalyzer machine because he has lung issues. Tr. 75. However, he admitted that he has not seen a medical professional to have his lung issues examined. Tr. 78. He denied cutting his breath short to prevent Trooper Shellhouse from obtaining a sufficient sample. Tr. 84. Further, Miracle remembered Trooper Shellhouse requesting a urine sample from him and being instructed to remain seated. Tr. 78. He also stated that he had already gone diarrhea in his pants and that one of the correctional officers had given him toilet paper to use in the restroom. Tr. 78.

{¶27} Based on this testimony, the Marion Municipal Court concluded that "Trooper Shellhouse offered two tests to [Miracle] who repeatedly failed to follow instructions and blow sufficiently into the BAC machine. Thus, leading Trooper Shellhouse to conclude that [Miracle] refused the tests." Doc. 4B. The Marion Municipal Court then found "f[ound] that [Miracle's] actions and general conduct manifest[ed] an unwillingness to take any tests." Doc. 4B. The evidence in the

record indicates that Miracle engaged in conduct that prevented Trooper Shellhouse from obtaining a sufficient breath sample and a urine sample. Further, Miracle was not able to establish that he was unable to perform the tests that were requested by Trooper Shellhouse.

{¶28} As to the Breathalyzer Test, Miracle stated that he was not able to provide a sufficient breath sample because he had lung issues. However, he admitted that he had not seen a doctor to diagnose or treat the issues with his lungs. Further, Miracle did not provide any information to substantiate this claim. *But see Williams, supra*, at ¶ 62 (concluding that the defendant did not refuse a breathalyzer test because she testified that she had had an esophageal surgery that prevented her from producing a consistent breath, presented a physician's note documenting the nature of her condition, and told the police officer of her condition at the time she attempted to take the requested test). Trooper Shellhouse also testified that he did not detect any breathing issues in his interactions with Miracle and that Miracle seemed not to be consistently blowing into the breathalyzer machine. Tr. 36-37, 96-97.

{¶29} As to the urine sample, Miracle went to the restroom with the knowledge that Trooper Shellhouse had asked him for a urine sample. Miracle had also been told to remain seated until Trooper Shellhouse had returned with a urine sample test kit. The fact that Miracle went to the restroom indicates that he was able to provide a urine sample. *But see Brown*, 2013-Ohio-4981, ¶ 12 (finding the

defendant did not refuse a urinalysis test when the officer testified that the defendant appeared unable to provide a urine sample after the defendant drank multiple glasses of water and attempted to produce a sample several times). In so acting, Miracle prevented Trooper Shellhouse from obtaining the requested urine sample.

{¶30} After reviewing the evidence in the record, we determine that Miracle has not carried the burden of establishing, by a preponderance of the evidence, that he did not refuse to submit to the chemical tests requested by Trooper Shellhouse. Thus, Miracle did not establish that the predicate condition to an ALS listed in R.C. 4511.197(C)(4)(a) was not present in this case. The record indicates that Miracle refused, through his conduct, to submit to the chemical tests requested by Trooper Shellhouse. For this reason, we find that the Marion Municipal Court did not err in upholding Miracle's ALS. Miracle's second assignment of error is overruled.

*Conclusion*

{¶31} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Marion Municipal Court is affirmed.

***Judgment Affirmed***

**PRESTON and ZIMMERMAN, J.J., concur.**

**/hls**